1

                    UNITED STATES DISTRICT COURT
                      DISTRICT OF NEW JERSEY
2                     Civil Action No. 09-197

3   _____

4   In Regard to the Matter of:

5   Bayside State Prison              OPINION/REPORT
    Litigation                          OF THE
6                                     SPECIAL MASTER

7   THOMAS COLLIER

              -vs-
8
    WILLIAM H. FAUVER, et al,
9
              Defendants.
10  _____

11

12

13

                    *      *      *      *
14

15          FRIDAY, JANUARY 23, 2009

16                  *      *      *      *

17

18

19

20  BEFORE THE HONORABLE JOHN W. BISSELL, SPECIAL MASTER

21

22

23

24

25

1

2

3

4               Transcript of proceedings in the above

5    matter taken by Theresa O. Mastroianni, Certified

6    Court Reporter, license number 30X100085700, and

7    Notary Public of the State of New Jersey at the

8    United States District Court House, One Gerry Plaza,

9    Camden, New Jersey, 08102, commencing at 12:30 PM.

10

11

12

13

14

15

16

17

18               MASTROIANNI & FORMAROLI, INC.

19        Certified Court Reporting & Videoconferencing

20                  251 South White Horse Pike

21                  Audubon, New Jersey 08106

22                      856-546-1100

23

24

25

3

1

2    A P P E A R A N C E S:

3

4         ROSELLI & GRIEGEL, PC
          BY:  MARK ROSELLI, ESQUIRE
5              - and -
          BY:  JAMES LAZZARO ESQUIRE
6         1337 STATE HIGHWAY 33
          HAMILTON SQUARE, NEW JERSEY  08690
7         609-586-2257
          ATTORNEYS FOR THE DEFENDANTS

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          JUDGE BISSELL:   I am now reopening

2    proceedings in the matter of Thomas Collier, docket

3    number 09-197.

4          This opinion/report is being issued

5    pursuant to the directives of the Order of Reference

6    to a Special Master and the Special Master's

7    Agreement and the guiding principles of law which

8    underlie this decision to be applied to the facts

9    upon which it is based as set forth in the jury

10   instructions in the Walker and Mejias jury charges to

11   the extent applicable to the allegations of Mr.

12   Collier.

13         As finalized after review under Local

14   Civil Rule 52.1, this transcript will constitute the

15   written report required under paragraph seven of the

16   Order of Reference to a Special Master.

17         Mr. Collier was housed in F Unit and he

18   witnessed Officer Baker's death.   In fact, he

19   witnessed him being stabbed at the podium.   He

20   testified, however, and I find that this testimony is

21   accurate, that he was afraid to acknowledge to

22   Internal Affairs when examined on that very same day

23   that he had witnessed this and did not respond

24   positively in that respect.

25         The inmates in F Unit as a whole were

1   out of F Unit for a long time on the 30th of July.

2   Pretty close to 12 hours.  And this is not surprising

3   because they were taken, first, to Internal Affairs

4   for interrogation and then later to the gym to await

5   their return.

6              While it's not expressly set forth in

7   this record, my best recollection is that the

8   facility was also searched at that time.  There is no

9   reason it wouldn't have been.

10              P-163 reflects that the SOGs went into

11   the unit to extract the inmates at approximately 1:10

12   PM and began those extractions at that time.  Mr.

13   Collier, like other inmates, went to Internal Affairs

14   and then to the gym.  It appears that he was not one

15   of the first persons taken to the gym because upon

16   examination of videotape, which I'll discuss a little

17   more completely in a few minutes, his testimony was

18   that he was not seated toward the front of the gym,

19   but that it was at least half full by the time he

20   arrived.

21              Mr. Collier said repeatedly and

22   insisted on both direct and cross-examination that

23   the position which he was directed to assume in the

24   gymnasium was with his upper torso bent from the

25   waist out from his body at a right angle or even more

1   than that with his head down and his hands clasped

2   behind his back, the back of his head.

3                    However, the film exhibits of F Unit,

4   and there were three of them shown in succession from

5   a time period of shortly after two o'clock PM until

6   after 6:30 PM, showed that none of the persons seated

7   in the gym on that day brought in from F Unit, and by

8   the latter of those tapes this would have included

9   Mr. Collier, were required to sit in any such

10  position.  They were expected to remain still and

11  they did so for the most part, but they were seated

12  essentially as we've come to call it Indian style on

13  the floor, legs crossed, hands down at the sides and

14  resting on the gym floor.

15                   At 8:35 according to Exhibit D-544A the

16  infirmary was summoned to the gym because Mr. Collier

17  had chest pains and trouble breathing.  I find that

18  this was brought on not by him having been subjected

19  for several hours to this seating position which he

20  described, but rather from increasing anxiety and

21  exhaustion.  I find that his testimony is credible

22  that he may well have had to have been dragged or

23  assisted in moving to the back of the gym from his

24  seat on the floor to await the arrival of the nurse,

25  but I do not find it is credible that he was slammed

1    up against the grate and sustained cuts to the back

2    of his head as he testified here.  That type of

3    conduct is totally inconsistent with that observable

4    on the three films that were shown with regard to the

5    manner in which one or more inmates was indeed

6    removed from the line on the floor for one reason or

7    another.

8              Now, I realize that the event that

9    occurred with Mr. Collier's discomfort occurred at

10   about 8:30 PM, approximately two hours after the

11   conclusion of the last of the videotapes that we

12   watched, but I find no basis to conclude that somehow

13   or other after those tapes were no longer being

14   taken, that the SOG officers on the very first day of

15   this operation with a high level of administrative

16   and civilian scrutiny woulde suddenly change their MO

17   dramatically, force the inmates into much more

18   uncomfortable seating positions, drag them across the

19   floor and bounce them off the grate.  Furthermore, if

20   indeed he had been cut on the head and treated, I

21   find no reason why there would not be a nurse's note

22   about it.  Once again, we are at the very outset of

23   these proceedings, he was treated in the gym area

24   initially and I find no evidence, although he asserts

25   it, that there was any sort of master coverup of

1   injuries of this sort which included the nurses
2   either as willing or unwilling participants.
3              In Mr. Collier's case he was well cared
4   for in the infirmary, his arrival there was
5   documented, he was kept there overnight as a
6   precaution in light of his difficulties in breathing
7   and chest discomfort and returned to F Unit on the
8   next day.
9              He testifies as to another event on or
10  about the fifth of August, it's determined from
11  P-164, a log indicating that SOG entered F Unit on
12  that day as well.  They were extracting him from his
13  cell and undertaking a strip search and at that point
14  ordered him to undertake the very customary activity
15  of spreading his legs, squatting and otherwise making
16  himself susceptible to a rectal body cavity search.
17  He resisted that order, from his own testimony, and
18  questioned why it was that he particularly would have
19  to be so searched because he wasn't concealing any
20  weapon there.  However, the officers insisted, as
21  they had every right to do, to complete their
22  procedure which included a rectal area search and one
23  of them using his baton prodded him in that area,
24  without penetration, to enforce the demand that Mr.
25  Collier place himself in such a position that that

1   rectal search could be conducted.  I find that at

2   most there was used a modest force necessary to

3   achieve this valid penal purpose.

4            Mr. Collier testified to other

5   incidents of harassment to which he was subjected

6   after the incidents mentioned above.  However, they

7   do not rise to the level of the infliction of

8   punishment as encompassed in these proceedings.

9   Among other things, there was no discernible physical

10  impact or even potential injury that resulted.

11           Mr. Collier is a man with mental

12  difficulties that, among other things, required

13  ongoing medication to curb schizophrenia.  This was

14  indeed a long-standingcondition which he brought with

15  him to Bayside.  Frankly, it does not take a great

16  leap of faith or any expertise, I think, for me to

17  conclude that his anxiety from witnessing Officer

18  Baker's murder, his anxiety of being questioned about

19  it and, in fact, lying to Internal Affairs that he

20  hadn't observed it, and his lengthy sitting on the

21  gym floor, in a situation obviously of considerable

22  uncertainty and stress for him, are what led to his

23  chest and breathing problems, as I mentioned before.

24           As to the other incident, his

25  incredulity that he would be suspected of harboring a

1   weapon in a body cavity led him to question and

2   resist this very legitimate routine search request.

3   And indeed, of course, he was further embarrassed at

4   being prodded in the rectum, accompanied by some very

5   crude comments, once again for the purpose of getting

6   him to comply.

7           Mr. Collier evokes from me as well as

8   from anybody else a measure of concern for the very

9   difficult mental condition that he carries with him.

10  But the events in question here neither rise to the

11  level of the use of excessive force or, indeed, the

12  infliction of punishment at all.

13          Finally, although not every item of

14  evidence has been discussed this this opinion/report,

15  all evidence presented to the Special Master was

16  reviewed and considered.

17          For the reasons set forth above, I

18  recommend in this report that the district court

19  enter an order and judgment of no cause for action

20  with regard to Thomas Collier.

21

22

23

24

25

C E R T I F I C A T E

    I, Theresa O. Mastroianni, a Notary Public and Certified Shorthand Reporter of the State of New Jersey, do hereby certify that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place, and on the date hereinbefore set forth.

    I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.


*Theresa O. Mastroianni*
Theresa O. Mastroianni, C.S.R.
Notary Public, State of New Jersey
My Commission Expires May 5, 2010
Certificate No. XIO857
Date: February 10, 2009